Filed 8/20/25  In re W.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.B., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVCES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.V. et al., <br><br> Defendants and Appellants. | F088142, F088304, F088516 <br><br> (Super. Ct. No. JD145421-00) <br><br> **OPINION** |

APPEAL from orders of the Superior Court of Kern County.  Susan M. Gill, Judge.

S.V., in pro. per.; Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant S.V.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant A.S.

Margo A. Raison, County Counsel, and Kelli R. Falk, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

This is a consolidated juvenile dependency appeal brought by minor W.B.'s mother, S.V. (mother), and noncustodial biological father, A.S. (father), from the dispositional order and other orders after judgment. At the disposition hearing, the juvenile court adjudged W.B. a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b) due to risk of harm from mother's untreated mental illness and substance abuse and removed him from her physical custody (§ 361). Mother was granted reunification services, but father was not.[2]

Mother, through counsel, argues the findings underlying the dispositional order were not supported by sufficient evidence and that the juvenile court erred by finding inquiry was proper under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA). Father joins in both arguments.

Father separately argues the juvenile court erred by summarily denying a postdisposition section 388 petition through which he requested reunification services.

In supplemental briefing filed by mother in propria persona after this court granted her request to represent herself in this appeal, she raises several issues, but only three that we have deemed cognizable: (1) the detention findings were not supported by sufficient evidence; (2) the jurisdictional findings were not supported by sufficient evidence; and

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] While this appeal was pending, mother's reunification services were terminated at the six-month review hearing, and a section 366.26 hearing was set. Mother filed a petition for extraordinary writ, which this court denied by written opinion. (*S.V. v. Superior Court* (Feb. 21, 2025, F088973) [nonpub. opn.].)

This court is informed that the section 366.26 hearing was conducted on June 12, 2025, and parental rights were terminated. Both mother and father have appealed from the order terminating their parental rights, and the appeal remains pending in *In re W.B.* (F090001). While the termination of parental rights may have rendered some issues raised in this appeal moot, because the parents have appealed from that order, and this appeal will be resolved before the section 366.26 appeal, we will address the issues on their merits to the extent they are otherwise properly before us.

2.

(3) her counsel rendered ineffective assistance based primarily on his alleged failure to introduce certain evidence.

We find no reversible error and affirm the orders from which the parents appeal.

## PROCEDURAL AND FACTUAL BACKGROUND

On December 11, 2023, the Kern County Sheriff's Department and Ridgecrest Police Department got involved in a dispute between mother and W.B.'s maternal grandmother regarding the care and safety of then three-month-old W.B. The maternal grandmother had W.B. with her and was refusing to return him to mother because she was concerned about his health and safety in mother's care. According to the maternal grandmother, mother had mental health issues, including bipolar disorder and depression, and substance abuse issues that prevented her from caring for W.B. safely. At that time, law enforcement determined that mother did not meet the criteria for a 72-hour hold and that W.B. could be returned to her.

The following day, December 12, 2023, Ridgecrest Police did a follow-up welfare check on mother and W.B. and observed mother to be under the influence of drugs though W.B. was not present. She admitted to smoking methamphetamine earlier that day after she got a babysitter to watch W.B. and estimated she had smoked methamphetamine approximately three times since she gave birth. The officer determined an arrest would not be appropriate under the circumstances.

Later that day, mother reportedly called the maternal grandmother and asked her to pick up W.B., stating "I don't know what's wrong with him, come fucking get the baby," because he was crying and having diarrhea issues, and the maternal grandmother did so without incident. Law enforcement made referrals to the Kern County Department of Human Services (department) based on its contacts.

During the department's investigation, the maternal grandmother reported to the social worker that prior to December 11, 2023, she had had W.B. in her care since December 5. When she picked him up on December 5, his clothes were dirty, and he

3.

smelled of urine and feces. Since she had W.B. in her care, mother had been calling and texting her and saying she hated W.B. and was "[a]ll over the place" and mentioned that she wanted to kill herself. The maternal grandmother told the social worker that on the previous Thanksgiving, mother had told her brother she had stopped taking her medication. She further reported mother had a history of mental health issues and drug use.

The officer who performed the welfare check on December 12, 2023, reported to the social worker that he did not arrest mother for child endangerment at that time because she had arranged for W.B.'s care while she was using drugs. He expressed concerns, however, about mother's mental health and drug use, and told the social worker mother admitted she had never taken her psychotropic medication as prescribed because she did not want to.

On December 14, 2023, the department received a referral alleging severe neglect of W.B. It was alleged the maternal grandmother took W.B. to the emergency room because she was concerned he had gotten assaulted or gotten into illegal substances. He presented with a bruise/moderate hematoma to the right side of his forehead, rapid eye movement, deviation of one of his eyes, and mottled skin. The referral was deemed inconclusive.

On December 16, 2023, the sheriff's department was dispatched to the maternal grandmother's residence where mother was outside the home behaving erratically, speaking incoherently, and crying hysterically. Sheriff deputies determined mother was under the influence of methamphetamine and arrested her for public intoxication.

Mother subsequently obtained care of W.B. from the maternal grandmother, and the social worker made an unannounced visit on December 20, 2023. Before entering, the social worker heard mother yelling and cursing. During the visit, the social worker observed W.B. in a swing with a bottle in his mouth, propped up with a blanket. The social worker discussed safe sleeping and bottle rot with mother, and mother removed the

4.

bottle and blanket. The social worker also advised mother to not yell so much and so loudly with W.B. in her care, and mother responded that she was yelling at her dogs but that she would work on it. The social worker provided mother with information on "Differential Response" (DR) services.

On January 2, 2024, the social worker and a Ridgecrest Police Department officer made an unannounced visit to mother's home, and W.B. had been left in the care of mother's friend. The friend reported mother had left about 10 minutes prior, and the social worker observed W.B. was in a swing with a bottle next to his neck as if it had been propped up with a blanket. The social worker observed that W.B. appeared to have difficulty focusing and that his eyes were moving from side to side. Mother returned to the home during the visit and was again advised on sleep and bottle safety. The social worker advised mother that a public health nurse would be contacting her due to concerns with W.B.'s eyes, and mother reported she told the maternal grandmother about W.B.'s eyes and was told it was normal.

Mother accepted DR services on January 4, 2024, and had an intake scheduled for the following week. The DR case manager also noted that W.B.'s eyes wandered or moved oddly.

Mother spoke to the public health nurse on January 5, 2024. She reported W.B. was able to track with his eyes. She did notice something to do with his eyes when he was about a month old, but she brought it to the attention of the maternal grandmother and did not feel like it was a concern at the time. The public nurse brought up the issue of bottle propping, and mother reported she only did it when she had to do something for a short period of time. Mother was advised to never bottle prop because W.B. could choke, aspirate, and even die, and mother agreed not to do it anymore.

On January 8, 2024, the department received results that mother had tested positive for methamphetamine on December 18, 2023. The social worker visited mother's home that day to drug test her. Mother appeared "to be very on edge," "out of

it," and "not fully knowing what was going on" and was unable to provide a urine sample for the drug test.

The following day, on January 9, 2024, W.B. attended a medical appointment, and the doctor was "definitely concerned with … 'nystagmus' and possible seizures reported by the mother." The doctor looked at a video mother provided and was unable to see W.B. stop breathing or turning blue as mother reported. The doctor reported to the social worker that she was concerned she was unable to find hospital records confirming that mother brought W.B. to the emergency department when he reportedly stopped breathing. She also noted mother had "pressured speech" and disorganized thought process at the appointment, which suggested to her that mother may not be taking her bipolar disorder medication.

Later that day, the public health nurse and social worker visited mother's home. Mother disclosed she previously had concerns about W.B.'s eyes and strange movements that she had suspected were seizures, but the maternal grandmother told her the "episodes" were normal. Mother showed the public health nurse the videos, and the public health nurse thought W.B.'s movements appeared normal. Mother reported she deleted videos of W.B.'s lips turning blue and that during the episodes, W.B. would go limp and it would take her two to 10 minutes to fully wake him. She first noticed the episodes when W.B. was one month old but did not seek medical attention because the maternal grandmother told her they were normal and because she had had a bad experience at the hospital where she gave birth. The episodes had decreased over time. She further stated that she had used methamphetamine three times since W.B. was born, and had last used on December 11 or 12, 2023. She got upset during the home visit and raised her voice, and W.B. started to cry. She disclosed to the social worker that she had "spazzed out" earlier and yelled and broke glass because she was upset, all while W.B. was in her care. The social worker advised mother she needed to control her emotions

6.

when W.B. was around, to which mother said "no" and explained that because she had bipolar disorder she was allowed to lose control.

On January 10, 2024, the department filed a dependency petition on W.B.'s behalf, and he was placed into protective custody. The petition alleged that W.B. had suffered, or was at risk of suffering, physical harm due to mother's inability to provide care to him due to mental illness and substance abuse. It was specifically alleged that mother used methamphetamine on December 11, December 16, and December 18, and was suffering from untreated bipolar disorder. W.B. was placed with the maternal grandmother.

The social worker subsequently informed mother that her voluntary case plan consisted of parenting/neglect classes, substance abuse services, a mental health assessment and recommendations, and random drug testing. Mother stated it would be difficult for her to participate in services because she was a student and school was starting. She agreed to drug test but was unable to provide a urine sample.

At the initial hearing conducted on January 12, 2024, mother left the courthouse before the case was called, and later reported she did so because she got upset reading the report and decided to leave because the situation was difficult to deal with. Mother's attorney entered a "protective denial" to the allegations and lodged a "general objection to continued detention." Counsel further represented that mother had reported she had some Cherokee ancestry, and that the maternal grandmother would have more information. The juvenile court found there was a reason to believe W.B. may be an Indian child based on mother's assertion. The court further found that a prima facie showing had been made that W.B. came within section 300, that there was a substantial danger to his physical health, and there were no reasonable means of protection without removal. The court noted mother was "experiencing some difficulties with substance use and care of the child, propping the bottle up to the child, even after being told that that was not safe to do, letting her mother take care of the child then retrieving the child and saying that it's okay for her to, I think she used the term spaz out because she has a

7.

mental illness." The court stated it was sympathetic to those that suffer from mental illness because it was "not a choice," but W.B. was not safe in mother's care at that time. The court ordered W.B. detained from mother. Mother was ordered to have supervised visits to occur twice weekly for two hours.

Following the detention hearing, mother expressed to the social worker she was unsure if she could handle visiting with W.B. because she would not be able to take him home. She also expressed that her brain would not let her look into her voluntary case plan components and that she had been wrongfully accused. When the social worker encouraged mother to visit W.B., she responded, "I doubt I will. I can't." She later expressed she was not doing well after losing W.B. because he was the only reason she kept living. She admitted to using drugs when she is stressed and started using when she experienced a miscarriage in 2021. She admitted to using methamphetamine on January 18, 2024, but asserted that she would not have done so had W.B. not been removed from her care.

W.B. was given ophthalmology and neurology referrals for his eye issues. When the public health nurse sought information from mother regarding W.B.'s medical history, mother first reported she would not provide medical information while W.B. was placed with the maternal grandmother. She eventually agreed to provide some medical information, primarily that W.B. did not have any health issues and that the maternal grandmother was making up concerns. Mother did not want to express any concerns for fear they would be used against her.

Mother visited W.B. on January 19, 2024. Throughout the visit, mother spoke poorly of the maternal grandmother and used profanity. When the worker supervising the visit tried to redirect mother from inappropriate subjects and language, mother responded that she did not care and had the right to talk to her baby about anything she wants. Mother requested the visit to end early.

The following day, mother told the social worker she was stressed about what to do with W.B. during visits.  The social worker gave mother some suggestions and provided her with a list of resources for enrolling in services and told mother she could reach out to her if she had any questions.  Mother failed to attend subsequent scheduled visits.

The maternal grandmother reported that on January 22, 2024, mother cancelled a medical appointment that W.B. had with an ophthalmologist at his pediatrician's advisement because mother maintained there was nothing wrong with him.

On January 23, 2024, mother called the social worker to express concern about W.B.'s wellbeing in the maternal grandmother's care.  When the social worker advised mother not to cancel W.B.'s medical appointments, mother stated she would continue to do so because she "is petty like that and that nothing is wrong with her son."  When asked about her voluntary case plan components, mother responded that she did not know where to start so she probably was not going to do them.  The social worker encouraged her to focus on her case plan, and mother said she did not have the mental capacity to and could not focus until she knew W.B. was properly taken care of.  Mother later reported she would not be participating in her case plan because she wanted to fight the case on her own and that she would not be attending more visits with W.B. because she could not mentally handle it.

In February 2024, the maternal grandmother reported that mother was interfering with W.B.'s medical care and appointments.  W.B. was recommended to have both vision therapy and gross and fine motor therapy, and mother refused to sign paperwork for the treatment.  On one occasion, at a medical appointment for W.B., mother yelled and cursed and had to be escorted out of the building; she accused the doctor of making up lies and insisted W.B. had nothing wrong with him.  At another appointment, mother again refused to listen to recommendations from the doctor insisting that W.B. did not need any therapy and got angry and stormed out.  Additionally, the department had

9.

received a referral alleging general neglect due to mother's behavior at a medical appointment, where she was "flinging [W.B.] around" without supporting his head while trying to move away from the maternal grandmother, and stated W.B. did not need medical care and would not get him medical care if he were returned to her. She was reported to have said she "would kill the baby" and if she "cannot have him, no one could." She had to be escorted out of the building. The referral was evaluated out.

Based on this information, W.B.'s counsel requested an ex parte hearing on his request to limit mother's developmental rights and restrict her from interfering in W.B.'s medical and developmental appointments.

On February 21, 2024, the juvenile court granted the ex parte petition and ordered that mother was not to be told in advance of medical appointments, was not to attend, and was only to be told about them after they had been held. The court further ordered that if medical treatment was needed and mother did not consent, authorization was to be sought from the court. The parents' right to make educational and developmental decisions was limited, and the maternal grandmother was appointed to make the educational and developmental decisions for W.B.

Between December 2023 and February 2024, mother did some drug testing; she tested positive for amphetamine and methamphetamine three times, with two of those tests additionally coming back positive for cocaine, and missed three tests.

The department filed a declaration regarding ICWA inquiry efforts on March 11, 2024, indicating maternal relatives had claimed Cherokee and Choctaw ancestry. Inquiry was sent to the relevant tribes. The Cherokee Nation responded that they would not be involved based on the information provided. Mother and W.B. were not registered as tribal citizens but "without identifying information for the child's biological father, an ICWA determination cannot be made."

On March 13, 2024, the juvenile court conducted a jurisdictional hearing; mother was present and contested the recommendation that the court assume jurisdiction. The

court found there was no reason to know W.B. was an Indian child but that the department had a continuing duty to inquire in compliance with ICWA.

At the hearing, mother testified she had been diagnosed with bipolar disorder and bulimia nervosa and took three medications for her bipolar disorder every day. The most recent was prescribed in February 2024 to treat her depression. She had always consistently taken her medication and seen her psychiatrist. She did not participate in therapy, only medication management.[3]

Mother testified she "absolutely" did not believe her mental health disorders prevented her from taking care of W.B. She had "really bad" postpartum depression but she "overcame that issue a while ago." She had used methamphetamine and cocaine since W.B. was born but did not care for W.B. while under the influence and would not do so. She maintained she was not addicted to drugs. She explained she used methamphetamine on December 11, 2023, because the maternal grandmother had kept W.B. from her for two weeks. She admitted to using methamphetamine in the last month because she could not get W.B. back. She had since stopped using because the social worker had made her feel like she had a chance of getting W.B. returned. When asked if W.B. were to remain detained, would she resort to using methamphetamine or cocaine to deal with that issue, she responded, "I don't want to say I would. I mean I'm not going to say I wouldn't." W.B. was the only reason she got herself together and was willing to seek substance abuse counseling for him. She further testified she had not acted out or done anything that the maternal grandmother or pediatrician accused her of.

The juvenile court questioned mother on whether she understood that W.B. needed medical care due to his nystagmus diagnosis. Mother explained she felt the condition was hereditary and had tried to address the issue when W.B. was a month old by taking

---

**3**     Mother later represented to the juvenile court at the disposition hearing that her psychiatrist recommends therapy, but mother chooses not to do it.

11.

him to the emergency room, but they told her he was fine.  She further explained she felt it has gotten worse and she would have addressed it if it was as bad as it was then.  She eventually told the court she understood the issue needed to be addressed.

In ruling, the juvenile court noted the evidence, including her own statements and behavior, supported that mother was not taking her medication consistently while caring for W.B.  The court further noted that W.B.'s eye issues had been brought to mother's attention and she was maintaining that he was fine which could affect his treatment.

The juvenile court sustained the petition and found that W.B. was described by section 300, subdivision (b).  The court ordered mother to undergo a psychological evaluation to determine whether she would benefit from reunification services, and if so, what type of services would be beneficial.  The court lifted the order restricting mother from attending medical appointments; mother was permitted to attend appointments but could not cancel them.  The court continued the matter for disposition.

On April 3, 2024, mother requested a *Marsden* hearing.  She contended that she had wanted to present evidence to contest the allegations in the department's reports since the detention hearing, and her attorney had not allowed her to.  Mother's attorney represented that he did not try to keep mother from contesting anything but that she had left the courthouse before her case was called for the detention hearing, so he objected and denied the allegations.  He admitted he failed to notify mother of the ex parte hearing regarding medical appointments but the orders preventing her from attending medical appointments were lifted at the jurisdiction hearing.  Counsel explained he and mother viewed the evidence differently and that mother did not want to hear how to proceed through the case but "just wants to hear that this should have never happened, her child should have never been taken, the warrant was unjust, whatever the issues are."  He had explained to mother that she would need to resolve her methamphetamine use prior to W.B. being returned, but mother wanted to say, "I'll stop if you give me my child back." Counsel made that argument at the jurisdiction hearing, but it "didn't land."  After

12.

hearing further from mother, the juvenile court found there had been a complete breakdown in the attorney-client relationship that would make it impossible for counsel to represent mother and granted the motion. Mother was appointed new counsel.

Between the jurisdiction hearing and the date set for the disposition hearing, mother did not attend any visits with W.B. Mother refused to attend visits despite department encouragement because she stated it was too much for her. She also refused to attend her psychological evaluation. At several points during the review period, mother told the social worker to stop contacting her. At one point, she stated she would call the police if anyone from the department went to her house. She missed drug testing in March and April.

The maternal grandmother reported mother continued to intervene with W.B.'s medical appointments, insisting there was nothing wrong with him and was advised to speak with W.B.'s attorney.

In its initial disposition report dated April 22, 2024, the department recommended mother be bypassed for reunification services because she was refusing to attend the psychological evaluation.

A supplemental ICWA declaration filed on April 23, 2024, indicated it had received responses from all but one of the tribes, and none of the responding tribes had indicated W.B. was an Indian child.

On the date initially set for the disposition hearing, April 26, 2024, the juvenile court declared alleged father A.S. W.B.'s biological father. The court granted mother a continuance because of the department's bypass recommendation. The court found there was no reason to know W.B. was an Indian child but that the department had a continuing duty to inquire.

Mother eventually attended her psychological evaluation on May 2, 2024. The clinician opined mother was a good candidate for reunification services. She recommended mental health treatment and noted "[i]t is imperative that [mother]

13.

continue to undergo mental health treatment and this should be monitored closely to ensure her compliance with treatment. Specifically, there should be a complete diagnostic assessment completed to determine if she is suffering from Postpartum Depression as I suspect she is." The clinician also recommended parent effectiveness training, a child neglect/endangerment class, and mental health counseling, "specifically to address her history of trauma."

Accordingly, the department changed its recommendation to granting reunification services for mother. Reunification services were not recommended for father as he was not in compliance with his case plan in a separate dependency case regarding W.B.'s half sibling, including not drug testing.

A supplemental ICWA inquiry declaration was filed on May 23, 2024, stating a response had been received from the final tribe indicating that W.B. was not an Indian child.

The uncontested disposition hearing was conducted on May 29, 2024. The juvenile court found there was no reason to believe or know that W.B. was an Indian child and adequate inquiry had been conducted. The court adjudged W.B. a dependent of the court and removed him from mother's custody. Mother was deemed to have made no progress toward alleviating the causes for out-of-home placement. She was ordered to participate in reunification services, including substance abuse counseling, 26 weeks of parenting and child neglect/endangerment classes, a mental health assessment and recommended treatment including medication management, and random drug testing. The court did not order placement with father, finding by clear and convincing evidence that placement would be detrimental to W.B., and father was not ordered reunification services based on the court's finding they would not benefit W.B.

On June 24, 2024, minor's counsel filed a request for an ex parte hearing regarding mother's interference with medical appointments, and a hearing was conducted on June 27, 2024. Minor's counsel requested an order that mother not reschedule,

14.

interfere in, or attend W.B.'s medical appointments. At the hearing, the maternal grandmother testified that W.B. had had a medical appointment on June 19, which mother and father attended. At the end of a two-hour assessment, mother started accusing the maternal grandmother of hurting W.B. by rocking him so his eyes would not focus. Mother became "volatile" with staff but eventually the appointment continued. Mother had ceased being volatile but would not allow the maternal grandmother to answer medical questions. The medical provider had to use the appointment time to talk directly with mother, and then asked the maternal grandmother to meet later so she could reassess W.B. and discuss a possible diagnosis with the maternal grandmother. Mother tried to leave the building with W.B. and started screaming and calling the maternal grandmother names when the maternal grandmother tried to retrieve W.B. Mother also rescheduled an appointment for genetic testing, but the maternal grandmother changed it back to the original day. The juvenile court ordered that mother not be notified in advance of medical appointments and not attend medical appointments but was to receive a complete synopsis of them after they occur.

On August 7, 2024, father filed a section 388 petition requesting, as relevant here, reunification services. He attached several documents related to good participation in and completion of parenting classes, a document dated September 19, 2023, indicating he participated in a substance abuse assessment and did not meet a medical diagnosis for outpatient services, and negative drug tests from June and July 2024.

The juvenile court summarily denied father's petition.

## DISCUSSION

### I.    Sufficiency of the Evidence to Support the Dispositional Order

Through counsel, mother contends the juvenile court's findings underlying the order removing W.B. from mother's physical custody were supported by insufficient evidence. Mother argues W.B. should have been left in mother's custody, with family maintenance services. Father joins in this argument, raising no independent grounds for

15.

reversal. The department contends this claim has been forfeited because the parents did not challenge the removal order below.[4] We agree with the department.

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) However, "when the merits of a case are contested, a parent is not required to object to the agency's failure to carry its burden of proof." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.)

In juvenile dependency sufficiency of the evidence cases, reviewing courts have distinguished between when a parent "submits" on the child welfare department's reports and when a parent "submits" on the department's recommendations in determining whether the merits are contested or not and therefore whether a parent has forfeited the claim.

Where a parent "submits" on the department's report and any accompanying evidence offered by the department, a challenge to sufficiency of the evidence is preserved for appeal even if no argument is offered concerning the department's recommendation. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 588–589; *In re Tommy E.* (1992) 7 Cal.App.4th 1234, 1237–1239; *In re T.V.* (2013) 217 Cal.App.4th 126, 136.) Under such circumstances, the parent is acquiescing as to the state of the evidence only. (*In re Richard K.*, at p. 589.) The juvenile court is obligated to "weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved." (*Ibid.*)

---

[4]     In her reply brief filed in propria persona, mother responds to this contention only by stating that, at the April 26, 2024 hearing, she objected to the bypass recommendation, but mother ultimately was not bypassed for services.

On the other hand, when a parent "submits" on the recommendation, such affirmative action goes beyond simply agreeing that the juvenile court may decide the issue before it on an uncontested record. It represents to the court agreement with the appropriateness of the recommendation. (*In re Richard K.*, *supra*, 25 Cal.App.4th at p. 589.) The acquiescing parent may not then complain when the court makes the recommended order. (*Id.* at pp. 589–590; *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813.)

Here, mother's counsel stated, "We will be submitting on the recommendations for family reunification services in this case" and made no additional statements or arguments. Because this expressed agreement with the appropriateness of the recommendations, which necessarily included removal, we agree with the department that mother forfeited her challenge to the removal order. Accordingly, we will not address its merits.

## II.    ICWA

Under California's statutory scheme to comply with ICWA, the juvenile court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child."[5] (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court,[6] rule 5.481(a).) The agency's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is,

---

[5]    An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

[6]    All further rule references are to the California Rules of Court.

or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b)(2).)

When initial inquiry gives rise to a "reason to believe"[7] (but not sufficient evidence to determine there is a "reason to know"[8]) that an Indian child is involved in a proceeding, "further inquiry regarding the possible Indian status of the child" is required, which includes gathering additional biographical information from family members and contacting relevant tribes. (§ 224.2, subd. (e)(2)(A)–(C).)

The department "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Rule 5.481(a)(5).) Before finding ICWA inapplicable, the juvenile court must make a finding that the department conducted

---

[7]    "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1)–(6). (§ 224.2, subd. (e)(1).)

[8]    These enumerated grounds for "reason to know" are: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and/or] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2025).)

18.

"proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

We review the juvenile court's finding that there is no reason to know whether a child is an Indian child for substantial evidence, and the court's finding that the department has conducted a proper and adequate inquiry and due diligence for abuse of discretion. (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601 (*K.H.*).)

Regarding the juvenile court's discretion in evaluating the department's inquiry efforts, this court explained in *K.H.*, "so long as the agency conducts a reasonable inquiry and documents its results, the juvenile court will have the room to exercise its discretion in determining whether the agency's efforts are sufficient to satisfy the mandates of ICWA and related California law." (*K.H.*, *supra*, 84 Cal.App.5th at p. 604.) "[R]easonableness, viewed through the lens of ICWA's purpose, is the touchstone. The agency's inquiry must extend far enough to reasonably ensure that if there is information the child is or may be an Indian child, that information is gathered." (*Ibid*.) ICWA determinations are best left "for the juvenile court in the first instance because it is better positioned to evaluate the evidence provided by the Department. So long as the court ensures the inquiry is reasonable and of sufficient reach to accomplish the legislative purpose underlying ICWA and related California law, the court will have an adequate factual foundation upon which to make its ICWA finding." (*K.H.*, at p. 621.)

Mother, through counsel, contends the juvenile court's finding at the dispositional hearing that the department's inquiry was adequate was an abuse of discretion. Mother contends the department did not document efforts to locate and interview maternal relatives other than maternal grandmother, maternal great-grandmother, and mother.

Father joins in mother's argument and adds that the inquiry was additionally inadequate because the inquiries sent to the tribes did not include his identity or any of the paternal relative's biographical evidence.

19.

Mother's argument appears to be based on incomplete information and is belied by the record. The department directs this court to the disposition report dated April 22, 2024, and supplemental disposition report, dated May 21, 2024, which thoroughly document telephonic inquiry of various maternal and paternal relatives who were able to be identified from January 2024 through April 2024, including the maternal grandmother, mother, a maternal aunt, maternal grandfather, maternal great-grandmother, paternal great-grandfather, paternal aunt, paternal great-uncle, and paternal grandmother. Additionally, telephonic inquiry was attempted but not successful with the maternal great-uncle, the maternal great-great-grandfather, the maternal great-aunt, a maternal uncle, and a paternal uncle, and all of these relatives were sent inquiries by mail.

Based on our review of the record, we find no error. The juvenile court could have reasonably determined the department's initial and further inquiries were adequate. The documentation demonstrates that the department identified available family members through family finding efforts and conducted or reasonably attempted to conduct initial inquiry with all of them. None of the paternal relatives gave the department a reason to believe W.B. was an Indian child; thus, further inquiry, including contact with tribes, was not required as to the paternal side, and we reject father's argument to the contrary. Maternal claims of Native American ancestry triggered the department's duty of further inquiry, and the department gathered biographical information, contacted relevant tribes, and gave the court updates as to the contents and results of those contacts.

The juvenile court was also reasonable in determining there was no reason to know W.B. was an Indian child. Based on the inquiry conducted, no tribe identified him as such.

We find no ICWA inquiry error.

### III. Summary Denial of Father's Section 388 Petition

Father argues the juvenile court erred by summarily denying his section 388 petition filed on August 7, 2024. He contends the court abused its discretion when it

found father had not made a prima facie showing of a change in circumstances sufficient to demonstrate that reunification services were in W.B.'s best interests.

The department contends this claim is moot because, as referenced in our previous nonpublished opinion in *S.V. v. Superior Court*, *supra*, F088973, father subsequently filed a similar section 388 petition, received an evidentiary hearing, and following that hearing, the juvenile court denied the petition.

On our own motion, we take judicial notice of our previous opinion and the underlying record on appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see *In re N.S.* (2016) 245 Cal.App.4th 53, 58 [appellate courts in dependency cases routinely consider postjudgment rulings that affect their ability to grant effective relief].) Father did not file a reply brief, and therefore does not appear to contest the department's assertion and did not object to the department's reference to, or its reliance on, our prior opinion though he had the opportunity to do so. (See Evid. Code, §§ 455, subd. (a), 459, subd. (d).)

The record on appeal in *S.V. v. Superior Court*, *supra*, F088973, indicates that father filed a section 388 petition requesting reunification services on September 18, 2024. Attached to his petition were many of the same documents attached to his August 7, 2024 petition. On September 25, 2024, the juvenile court granted an evidentiary hearing on the petition. The hearing was conducted on November 18, 2024, and father testified and offered photographs of his residence. After hearing the evidence and arguments from the parties, the court denied the petition, finding the proposed change was not in W.B.'s best interest.[9]

"A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.] A case becomes moot when events ' "render[] it

---

[9] To our knowledge, father did not challenge the denial of the September 18, 2024 section 388 petition on appeal.

21.

impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks. [Citation.]

"This rule applies in the dependency context. (*In re N.S.*[, *supra*,] 245 Cal.App.4th [at p.] 60 ['the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error'].) A reviewing court must ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.)

We agree with the department that there is no effective relief we can grant father, as he already received an evidentiary hearing on whether he should receive reunification services, based on the facts and circumstances presented to it at that time. As such, we conclude the claim is moot, and we will not address it on its merits.

IV.    **Mother's Supplemental Briefs**

A.    *Preliminary Matters*

While this appeal was pending, mother sought to strike her appointed attorney's brief filed on her behalf and represent herself in the appeal. This court denied her request to strike the opening brief but granted her request to represent herself and allowed her to file two supplemental opening briefs. Mother's supplemental briefing is lengthy and detailed, and we have read and considered all of her claims. As we have stated above, the primary cognizable claims mother raises are (1) insufficient evidence supported the juvenile court's detention and jurisdictional findings and (2) she was provided ineffective assistance of counsel due to several alleged failings, mostly involving her attorney's failure to present certain evidence. Several of her claims, however, are not cognizable for the reasons we set forth below, and thus we will not address them in detail. To the extent

22.

we do not expressly discuss any point raised in mother's briefs, we have considered it and rejected it.  (See *People v. Clair* (1992) 2 Cal.4th 629, 691, fn. 17.)

We start our analysis by emphasizing the burden is on the appellant to overcome the presumption of correctness and to demonstrate reversible error.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  To overcome this presumption, the appellant must support each contention with argument and citation to authority that demonstrates prejudice resulting from the error.  (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.)  This requirement applies equally to appellants who represent themselves on appeal.  (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247.)

Many of mother's claims are reliant upon facts based on her own recollection of events and documents not in the record.  Our review is limited to evidence that is on the record.  (See rule 8.204(a)(2)(C); see also *In re Zeth S.* (2003) 31 Cal.4th 396, 400 [generally, a reviewing court may not consider evidence that is outside the record on appeal and not considered by the trial court].)  Thus, we will not consider any of mother's assertions that are not supported by a citation to the record on appeal before us.  (See *Knapp v. City of Newport Beach* (1960) 186 Cal.App.2d 669, 679 ["Statements of alleged fact in the briefs on appeal which are not contained in the record and were never called to the attention of the trial court will be disregarded by this court on appeal."].)

One significant example we must mention because it is a recurring argument in mother's briefing is her challenge to the protective custody warrant in this matter. Mother contends the warrant issued in the underlying case was invalid because it was served before it was signed by a judge.  Mother does not cite her assertion with a valid citation to the record, and our review of the record does not support this assertion.  The

record indicates that a judge signed the protective custody warrant on January 10, 2024, the same day the warrant was served.[10]

Throughout mother's briefing, mother makes various legal assertions that she cites statutes, cases, and court rules to support. In evaluating mother's claims, we have discovered that many of mother's citations do not support the assertions she makes. For example, she asserts that in the case *In re Matthew S.* (1996) 41 Cal.App.4th 1311 (*Matthew S.*), "dependency findings were reversed when social workers failed to confirm third-party observations that formed the basis of their recommendations" and "reliance on out-of-context medical observations led to the reversal of dependency findings." These are simply not accurate summaries of *Matthew S. Matthew S.* does not deal with failure to corroborate "third-party observations" or "out-of-context medical observations" and did not result in a reversal of any dependency findings; rather, the juvenile court there found one of the jurisdictional findings in question was supported by substantial evidence, and the dispositional order was affirmed. (*Id.* at p. 1321.)

As another example, mother states the facts in the present case "mirror" the facts in *In re William B.* (2008) 163 Cal.App.4th 1220 and cites the case as standing for the proposition that "termination orders" were reversed "due to procedural errors in obtaining and executing warrants." *In re William B.* does not deal with warrants whatsoever, and the order the appellate court reversed in that appeal was an order providing reunification services to a parent. (*Id.* at pp. 1227, 1231.)

---

**10** Mother attaches a document to her briefing she purports to be the protective custody warrant. This document is not properly before us, as mother did not properly seek to augment the record on appeal. (See rule 8.155.) However, while the filing date of the document is January 11, 2024, the document shows it was signed by the judge on January 10, 2024, the day the warrant was served. Mother does not cite any legal authority supporting her contention that the warrant is not valid because it was filed the day after it was served.

24.

These are only examples of a common occurrence in mother's briefing, which are not limited to cases but also include statutes and court rules.  A brief must contain reasoned argument and legal authority to support its contentions or the court may treat the claims as forfeited.  (Rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793.) That a party is in propria persona does not excuse compliance with these requirements. (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 524; see *Dills v. Redwood Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate court will not develop appellant's arguments for them].)  To the extent that any of mother's assertions are not supported by legal authority or are purported to be supported by legal authority that clearly does not support the stated assertion, we reject those assertions and claims, including those related to bias and due process violations, without going through every one of them in the interest of judicial economy, as they are numerous.

Mother also raises several issues for the first time in her reply brief.  Generally, appellate courts will not consider points raised for the first time in a reply brief, absent a showing of good cause, because respondent has not been given a chance to respond. (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)  Mother has not attempted to establish good cause as to why she did not raise the issues earlier, and we will not address them.

For these reasons, we will not address the majority of mother's claims in detail, and move to her substantive claims of insufficiency of the evidence and ineffective assistance of counsel.

### B. *Sufficiency of the Evidence to Support Detention and Jurisdictional Findings*

Mother contends the evidence was insufficient to support the juvenile court's detention and jurisdictional findings.  Specifically, she contends her substance use did not pose a risk to W.B., as there was no evidence that she used in his presence or while he was in her care, and law enforcement officers found her home to pose no physical

25.

hazards. She further contends her mental health conditions did not pose a risk to W.B. We conclude that both the detention and jurisdictional findings are supported by sufficient evidence.[11]

We review sufficiency of the evidence challenges to determine if substantial evidence supports the trier of fact's conclusion. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid.*) " 'The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)

At the detention hearing, a minor's detention must be supported by a prima facie showing that the child falls within section 300.[12] (§ 319, subd. (c).) The juvenile court's jurisdictional findings are determined by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

A child comes within the jurisdiction of the juvenile court under section 300 when, as relevant here: "[T]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" (§ 300, subd. (b)(1) "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or

---

[11]     Like with mother's challenge to the dispositional order, the department contends mother's challenges to the detention and jurisdictional findings have been forfeited by her failure to object below. However, this is not accurate. Mother objected to the detention findings and contested the jurisdictional findings and even offered evidence at the hearing. Because the department bore the burden of proof, we address mother's sufficiency of the evidence claims. (See *In re Javier G.*, *supra*, 137 Cal.App.4th at p. 464.)

[12]     Mother incorrectly states the standard is clear and convincing evidence at the detention hearing stage.

guardian's mental illness, developmental disability, or substance abuse" (§ 300, subd. (b)(1)(D)). The department must "prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) A court "need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Id.* at p. 602.) A parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid.*) However, " '[t]o establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " (*Ibid.*)

The Supreme Court has clarified that "substance abuse" under section 300, subdivision (b)(1) "bears its ordinary meaning of excessive use of drugs or alcohol," in that no professional medical diagnosis is required. (*In re N.R.* (2023) 15 Cal.5th 520, 555–556.) Substance abuse "must render a parent or guardian unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness." (*Id.* at p. 531.) Additionally, "harm may not be presumed from the mere fact of mental illness of a parent." (*Matthew S.*, *supra*, 41 Cal.App.4th at p. 1318.)

We conclude substantial evidence supported a prima facie showing that W.B. was described by section 300, subdivision (b)(1) at the time of the detention hearing. The department provided evidence that mother had used methamphetamine several times within a short period, supporting a finding that mother abused substances. It had also provided evidence that mother had mental health conditions, including bipolar disorder.

The juvenile court could have reasonably determined these conditions posed a risk of physical harm to W.B. at the detention hearing stage. With regard to mother's substance abuse, the court could have reasonably concluded W.B.'s young age required a

27.

high degree of attention and care that methamphetamine use would keep mother from providing. Though mother contends she did not have W.B. in her care when she used methamphetamine, there was evidence that mother was under the influence while trying to pick up W.B. from the maternal grandmother's care on December 16, 2023.

As for mother's mental illness, there was evidence that mother had admitted to others, including a law enforcement officer, that she was prescribed medication for the bipolar disorder that she did not take. She was observed yelling in W.B.'s presence and admitted she "spazzed out" and broke glass, and did not demonstrate insight into any harm it could have caused W.B. The juvenile court could have reasonably concluded the department made a prima facie showing that W.B. came within the definition of section 300, subdivision (b) based on the above.

We reject mother's contention that the juvenile court "failed to consider reasonable alternatives" before ordering W.B. detained from mother as required under section 319. The court expressly stated it did so on the record. The record supports the court's finding, as the reports indicate the department attempted to maintain W.B. in mother's home safely for weeks before removing W.B. from her care through unannounced home visits and offering services.

Moving to the juvenile court's jurisdictional findings, we similarly find substantial evidence supports them. In addition to the evidence presented at the detention hearing, circumstances between the detention hearing and the jurisdiction hearing shined additional light on mother's ability and/or willingness to safely care for W.B. Mother's medical records confirmed she had a professional diagnosis of bipolar disorder and was prescribed medication for it. Mother cited mental health and/or emotional issues for being unable to participate in vital parts of the dependency proceedings, including visitation with W.B., which she only did one time, and engaging in her voluntary case plan. At one point, mother told the social worker her mental health rendered her unable to simply confirm whether she was going to attend a scheduled visit with W.B. Several

28.

reported incidents of mother being disruptive to W.B.'s medical care demonstrated mother was unable or unwilling to understand that W.B. needed care regarding his eye issues. She admitted that she chose not to get care for issues in the past because the maternal grandmother told her there was nothing wrong with him and seemed unable or unwilling to move on from that rather than being able to accept that he now needed care despite what happened in the past. Mother admitted her emotional state had a direct effect on W.B. in her briefing, stating, "My child gets upset when I get upset, my child literally mirrors me, what I feel he feels even if I hide the way I'm feeling if my child is anywhere around he will let you know how I'm feeling."

As for substance abuse, mother submitted to some drug tests, which revealed she continued to use methamphetamine, as well as cocaine. She told the social worker that she used when she was stressed and had used recently because W.B. had been removed. At the hearing, mother again admitted she was using drugs because W.B. had been removed and could not say she would not continue if he were not returned to her. We note her own admissions in her briefing demonstrate she relied on methamphetamine to deal with stressful situations and suggested she denied responsibility for her own use of drugs. In her briefing, she explains she used methamphetamine on December 11, 2023, because the maternal grandmother "had been keeping [W.B.] from [her] for about a week" and on December 18, 2023, because of "the incident with my arrest, which left me traumatized." In her second supplemental brief, she contends she explained to the social worker the following:

> " 'I blamed my mother for the part she played as to why my life is the way it is seeing HAD SHE NEVER TOOK MY SON AND KEPT HIM FROM ME I WOULD OF NEVER HAD THAT RELAPSE AND WE WOULD'VE EVER BEEN HAVING THAT CONVERSATION, as a matter of fact I wouldn't even be dealing with CpS at all. I understand I'm an adult. I make my own choices, I am responsible for my own choices however, I'm not responsible for things certain individuals choose to do,

intentionally, that causes my life to be the way it is for nothing but their own benefit.…' "

In her reply brief, she contends her drug use "was in response to traumatic events" and takes issue with her attorney's statement that she used drugs to cope, stating it was "untrue." These assertions seem to suggest that mother blamed her drug use on others and/or external circumstances and further supports a reasonable inference that if exposed to "traumatic events" with W.B. in her care she would resort to using drugs.

Based on the above, the juvenile court could have reasonably determined mother's substance abuse and mental health conditions rendered her unable to care for and/or protect W.B. and created a risk of physical harm to him. Mother's drug use and mental health issues appeared to interfere with her daily life, including her ability to participate in two-hour twice weekly visits with W.B., and W.B. was very young and in need of specialized medical care.

We reject mother's suggestion that the juvenile court was required to accept her testimony and disregard information from the reports. We acknowledge mother testified she has always taken her medication as prescribed, however, the court was entitled to find this part of her testimony not credible due to conflicting statements and facts in the reports. On the other hand, the juvenile court could have accepted this testimony and still reasonably concluded that mother's mental health issues were not being adequately treated so as to pose a risk to W.B.'s physical safety as evidenced by her behavior documented in the reports.

We also reject mother's suggestion that the juvenile court could not rely on information included in the report to the extent that it contained hearsay. "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." (§ 355, subd. (b).) If a party raises a timely objection to specific hearsay evidence, the specific

hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based unless the petitioner establishes one or more of the following exceptions, including, as relevant here, that the hearsay would be admissible under any hearsay exception or that the hearsay declarant is a peace officer.  (§ 355, subd. (c)(1)(A) & (C).)  Here, mother did not make a timely objection to hearsay in the reports and thus the court was entitled to rely on it to make its jurisdictional findings.

For the foregoing reasons, we conclude the juvenile court's detention and jurisdiction findings were supported by substantial evidence and find no error.

### C.    *Ineffective Assistance of Counsel*

Mother makes several assertions throughout her briefing that her attorney provided ineffective assistance.  We conclude mother has not established ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, a parent must demonstrate:  "(1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficiency resulted in demonstrable prejudice."  (*In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1540.)  Generally, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus.  When it is raised in a direct appeal, it may be reviewed only "where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction."  (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.)  "The establishment of ineffective assistance of counsel most commonly requires a presentation which goes beyond the record of the trial….  Action taken or not taken by counsel at a trial is typically motivated by considerations not reflected in the record….  Evidence of the reasons for counsel's tactics, and evidence of the standard of legal practice in the community as to a specific tactic, can be presented by declarations or other evidence filed with the [petition for writ of habeas corpus]."  (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.)

31.

Throughout the course of her briefing, mother contends her counsel did not allow her to contest the recommendations or present any evidence she wished to present, including:

(1) testimony of her friend who would testify that the maternal grandmother would try to take custody of W.B. from her;

(2) text messages "going back years to show that [the maternal grandmother] was well aware of the dogs I had in my home way before Paternal Grandmother had ever even been to my home to see or meet the dogs";

(3) "court documents" between the maternal grandmother and the maternal grandfather showing the maternal grandmother had made "similar allegations" about the maternal grandfather not being able to care for mother; (Unnecessary capitalization omitted.)

(4) photographs of mother and W.B. from December 5, 2023, before the maternal grandmother showed up to "bribe[]" mother to take W.B.;

(5) text messages and testimony of her mother's friend showing her mother's friend relied on personal relationships with police officers which led to the welfare check on December 12, 2023;

(6) police logs;

(7) text messages between mother and the maternal grandmother showing that the maternal grandmother had used the fact that W.B. was not feeling well to keep him from mother and failed to take W.B. to get medical care in December 2023;

(8) text messages and witness testimony showing that the maternal grandmother had "set up" mother's contact with law enforcement on December 16, 2023, by inviting her to her home, resulting in mother's "false arrest" for being under the influence;

(9) text messages between her and the maternal grandmother showing she did not threaten her mother on December 17, 2023, and that what was said was taken out of context;

32.

(10) testimony of mother's sister who could have refuted "false accusations" made during the period of December 18 through December 28, 2023, because she was staying with her periodically throughout that time;

(11) cross-examination of the pediatrician who treated W.B. on January 9, 2024, and made observations of mother that led her to believe she may not be on her medication;

(12) cross-examination of the social worker to prove she "directed" the pediatrician to make certain observations;

(13) testimony of a witness who could testify the social worker entered mother's home without consent;

(14) testimony of mother's brother and best friend who could testify to her medication use and refute claims that she did not take medication regularly; and

(15) testimony of the maternal grandfather and stepgrandfather who could provide testimony about her mental health and parenting abilities.

Mother has failed to demonstrate her counsel's failure to present this evidence fell below an objective standard of reasonableness nor that she was prejudiced by his asserted failings.

With regard to witness testimony, a claim that counsel should have called additional witnesses at trial " 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood' " of resulting in a more favorable outcome. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) We cannot evaluate alleged deficiencies in counsel's representation solely on [an appellant's] unsubstantiated speculation.' " (*Ibid*.) Accordingly, "[o]n direct appeal, a claim of ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses. [Citation.] We cannot assume from a silent record that particular witnesses were ready, willing and able to give mitigating testimony, nor can we speculate concerning the probable content or substance of such testimony."

(*People v. Medina* (1995) 11 Cal.4th 694, 773.)  Consequently, in such a case "there is no evidence to support [the] defendant's claim of ineffective assistance in this regard." (*People v. Wash* (1993) 6 Cal.4th 215, 269.)  Here, mother has not supported with declarations what her proposed witnesses would have testified to, nor has she explained how they would have affected the outcome of the hearings.

With regard to the text messages, it appears mother attached several of them to the section 388 petitions she filed throughout the proceedings.  The juvenile court denied these petitions and determined that the evidence did not constitute changed circumstances or new evidence that would tend to promote the return of W.B. would be in his best interests, and mother has failed to properly appeal from these orders.  In any event, we have reviewed the information attached to her petitions, and it does not appear to relate to the relevant jurisdictional issues of whether or not mother's substance abuse and mental health conditions put W.B. at risk of harm.

Additionally, mother brought up many of these evidentiary issues at the *Marsden* hearing conducted on April 3, 2024.  Based on his comments at the hearing, it appears counsel viewed the evidence mother wished to present as irrelevant given her continued drug use.  (See *Catlin v. Broomfield* (9th Cir. 2024) 124 F.4th 702, 728–729 [" '[A]n attorney is not required to offer evidence that is unnecessary or redundant.' "].)  As we have stated, this assessment appears reasonable based on our knowledge of the evidence mother wished to present, and we also note that though the court granted mother's *Marsden* motion, it stated it was not finding mother's counsel had failed in his duties of representation.

Mother also contends her attorney failed to notify her about the February 21, 2024 ex parte hearing at which the juvenile court limited her ability to attend medical appointments and limited her educational and developmental decisionmaking rights and thus she was deprived of the opportunity to be heard or present evidence on her behalf in

violation of her due process rights.[13]  We acknowledge her attorney admitted he did not contact mother prior to the February 21, 2024 hearing.[14]  However, mother has not shown prejudice resulting from this failing, as mother was permitted to be heard on the issue at the subsequent jurisdiction hearing, where the court ordered mother would again be allowed to attend medical appointments.  She was also present and given an opportunity to be heard at a subsequent ex parte hearing on June 27, 2024, where her ability to attend medical appointments was again limited based on her continued interference.[15]

For the foregoing reasons, we conclude mother has not established her counsel provided ineffective assistance.

## DISPOSITION

The juvenile court orders from which the parents appeal are affirmed.


DE SANTOS, J.

WE CONCUR:


HILL, P. J.


FAIN, J.*

---

[13]  Mother repeatedly asserts her right to make medical decisions was limited but this is inaccurate.  Only her educational and developmental decisionmaking was limited.

[14]  As stated above, the attorney who failed to contact her was relieved as a result of mother's granted *Marsden* motion on April 3, 2024.

[15]  For this reason, we conclude other challenges mother makes in her briefing to the February 21, 2024 order, including that insufficient evidence supported them, are moot as we can provide no effective relief by reversing it.

*  Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.